## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIM MORROW and KEN CLARK, on behalf of themselves and all others similarly situated<br><br>            Plaintiffs,<br><br>v.<br><br>BAC HOME LOANS SERVICING, LP, a subsidiary of BANK OF AMERICA, N.A.<br><br>            Defendant. | CIVIL NO.: _____<br><br><br><br><br><br><br><br><br><br>DECEMBER 29, 2010 |

## <u>CLASS ACTION COMPLAINT</u>

### INTRODUCTION

1.      Kim Morrow and Ken Clark ("Plaintiffs") bring this suit on behalf of themselves and a class of similarly situated Connecticut residents to challenge the failure of Defendant, BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("Defendant" or "BAC") to honor its agreements with borrowers to timely and/or accurately modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

2.      Plaintiffs' claims are simple – when a large financial institution promises to modify an eligible loan to prevent foreclosure, homeowners who live up to their end of the bargain expect that promise to be kept. This is especially true when the financial institution is acting under the aegis of a federal program specifically targeted at preventing foreclosure.

3.      In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds as well as a partial guarantee against losses on $118 billion in

mortgage-related assets. In April 2009, Bank of America signed a contract with the U.S. Treasury (attached as Exhibit 1 and included by reference) agreeing to participate in HAMP -- a program in which BAC, as the servicing arm of Bank of America, received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

4.      As a participating servicer in HAMP, BAC has, in turn, entered into a standard agreement with Plaintiffs for a temporary trial modification of Plaintiff's existing note and mortgage. Each such modification agreement promises that if the borrower complies with the terms of the temporary modification agreement and the borrower's representations on which the offer of a modification was based continue to be true in all material respects, then the borrower will receive a permanent modification on the same terms. Plaintiffs, for their part, have complied with these agreements by submitting the required documentation and making payments. Despite Plaintiffs' efforts, Defendant BAC has ignored its contractual obligation to timely and accurately permanently modify their loan.

5.      As a result, Plaintiffs were wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. Defendant's actions thwart the purpose of HAMP and are illegal under Connecticut law.

6.      Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification. However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as Defendant to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by the servicer such as Defendant. On

2

information and belief, Defendant does not own a significant majority of the loans on which it functions as a servicer.

7.    Economic factors that discourage Defendant from meeting its contractual obligations under HAMP by facilitating loan modifications include the following[1]:

a.    Defendant may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

b.    The monthly service fee that Defendant, as the servicer, collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

c.    Fees that Defendant charges borrowers that are in default constitute a significant source of revenue to the servicer. Aside from income Defendant directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of Defendant's monthly service fee.

d.    Entering into a permanent modification will often delay Defendant's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a

---

[1] *See* Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

foreclosure, is often less clear and less generous.

e.     Fixed overhead costs involved in successfully performing loan modifications involve up-front cost to Defendant for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

8.     Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Defendant has serially strung out, delayed, and otherwise hindered the modification processes. Defendant's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Defendant, who are eligible for permanent loan modifications, and who have met the requirements for participation in the HAMP program, have not timely and/or accurately received permanent loan modifications to which they are entitled.

## JURISDICTION

9.     Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because this action is between parties that are citizens of different states and the amount in controversy is greater than $75,000. For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate. *Wachovia Bank, N.A. v. Schmidt,* 546 U.S. 303, 306 (2006). BAC is, on information and belief, a citizen of North Carolina. Plaintiffs are citizens of Connecticut.

10.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this matter is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

4

11.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the named Plaintiffs reside in this District.

## PARTIES

12.     Kim Morrow and Ken Clark are an unmarried couple residing at, and the owners of, 17 Tabor Road, Enfield, CT 06082.

13.     Bank of America, N.A. is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.

14.     BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

## FACTUAL BACKGROUND

### *The Foreclosure Crisis*

15.     Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[2]

16.     The number of Connecticut properties with foreclosure filings in 2008 was 84.87% higher than in 2007 and 570.49% higher than in 2006.[3]

17.     According to 2009 data, the numbers continue to rise; in the third quarter of 2009, foreclosures were filed on 5,113 Connecticut properties, a 10% increase over the same period of

---

[2] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.

[2] RealtyTrac Staff. Foreclosure Activity Increases 81 Percent in 2008. Jan. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=5681.

2008.[4] Overall in 2009, 19,679 individual properties in Connecticut had foreclosure filings against them which, while slightly less than 2008, still represents an increase of over 65.93% from 2007 levels.[5]

18.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

19.     The foreclosure crisis is not over. Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011. *See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

### *Creation of the Home Affordable Modification Program*

20.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 *et. seq.* (2009).

21.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C.A. §5201.

22.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or

---

[4] RealtyTrac Staff. U.S. Foreclosure Activity Increases 5 Percent in Q3. Oct. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=7706.

[5] RealtyRrac Staff. RealtyTrac Year End Report Shows Record 2.8 Million U.S. Properties with Foreclosure Filings in 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333.

make commitments to purchase troubled assets from financial institutions. *Id.*

23.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

24.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

25.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. §5219.

26.     The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

27.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures on the Federal Housing Finance Agency, Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal Reserve Board in their roles as "Federal property managers." 12 U.S.C. §5220.

28.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

29.     The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

30.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

31.     HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

32.     Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to the existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1000.00 for each HAMP modification.

### Broken Promises Under HAMP

33.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. BAC Home Loans Servicing, LP is a servicing business operated by Bank of America, N.A. and its actions described herein were made as agents for the entities that hold mortgage loans.

34.     Should a servicer elect to participate in HAMP,[6] they execute a Servicer Participation Agreement ("SPA") with the federal government.

35.     On April 19, 2009, Steve R. Bailey, Senior Vice President of Bank of America, N.A. executed an SPA, thereby making BAC a participating servicer in HAMP. A copy of this SPA is incorporated herein and attached as Exhibit 1.

---

[6] Certain classes of loans, namely those held by Fannie Mae, Freddie Mac or companies that accepted money under the TARP program are subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary.

36.     The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA 1.B.), and are incorporated by reference herein.

37.     The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." (SPA 1.A., 2.A.)[7]

38.     The Program Documentation requires Participating Servicers to evaluate *all* loans, which are 60 or more days delinquent for HAMP modifications. (SD 09-01 p. 4.) In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

39.     A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").[8] The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

---

[7] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation—Frequently Asked Questions ("HAMPFAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5). These documents together describe the basic activities required under HAMP and are incorporated by reference in the TPP Agreement signed by Plaintiff and herein.

[8] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

40. Servicers must apply the modification steps in the following order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio):

    a.    Step 1—Capitalization

    b.    Step 2—Interest Rate Reduction

    c.    Step 3—Term Extension

    d.    Step 4—Principal Forbearance

    e.    Step 5—Principal Forgiveness

41. BAC offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

42. If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

43. Defendant has routinely failed to meet its obligations under the Program·Directive. Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication from Defendant after providing the requested information. Borrowers who attempt to contact Defendant by telephone face long periods of time on hold and are transferred between service representatives in·a deliberate effort to cause the borrower to give up and to terminate the call. Defendant regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.

44. BAC has routinely failed to live up to its end of the TPP Agreement and offer

permanent modifications to homeowners. In February 2010, the U.S. Treasury reported that BAC's parent company had 1,066,025 HAMP-eligible loans in its portfolio. Trial periods have been started on only 237,766 of these loans. Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and 1% of the eligible pool) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement. The Treasury Report is attached hereto as Exhibit 6.

45.     By failing to live up to the TPP Agreement and timely and accurately converting TPPs into permanent modifications, BAC is not only leaving homeowners in limbo, wondering if their homes can be saved, BAC is also preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

### Kim Morrow and Ken Clark

46.     Plaintiffs are the owners of 17 Tabor Road, Enfield, CT 06082.

47.     On or about October 19, 2005, Plaintiffs took out a $147,500 mortgage loan (hereinafter the "mortgage loan") for their residence at 17 Tabor Road, Enfield, CT 06082.

48.     Plaintiffs' mortgage loan is serviced by BAC.

49.     On or about November 22, 2009, Plaintiffs began experiencing financial·hardship and fell behind on her payments.

50.     On or about December 18, 2009, sought help from Defendant in preserving their home of many years and making their mortgage more affordable. They mailed Defendant a hardship letter and, thereafter, applied for a HAMP loan modification.

51.     Defendant sent a letter to Plaintiffs offering them a loan modification entitled *Home Affordable Modification Trial Period Plan ("TPP")*.

52.     The TPP provided that the plan was effective April 1, 2010 and would run from April, 2010 to June, 2010. Her monthly mortgage payments (Principle, Interest, Taxes and Insurance) were $976.49, effective April, 2010.

53.     The first sentence of the TPP agreement provides: "If I am in compliance with this Trial Period Plan and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

54.     On or about March 12, 2010, Plaintiffs executed the TPP Agreement, and included documents requested by Defendant, and sent two copies of the TPP Agreement, along with the other documents to the Defendant. A copy of the executed TPP Agreement is attached hereto as Exhibit 7.

55.     The Trial Period Plan states "I understand that after I sign and return two copies of this Plan to the Servicer, the Servicer will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer."

56.     Plaintiffs timely made each of the probationary payments contemplated in the TPP Agreement due in April 2010, May 2010, and June 2010.

57.     During the TPP period, Defendant kept calling Plaintiffs and claiming that required paperwork was missing.  In response, Plaintiffs continually resent the requested paperwork and/or asked Defendant to send them any paperwork that they did not have.

58.     During this period, Defendant also claimed that it was missing the IRS Form 4506-T. Plaintiffs called Defendant 6 times asking them to send the IRS Form 4506-T.  Each time Defendant promised to mail IRS Form 4506-T, but it never did.

59.     After making the three payments contemplated by the TPP Agreement, Defendant did not offer Plaintiffs a permanent loan modification by the end of June 2010.

60.     Thereafter, Plaintiffs called Defendant and asked them about the status of the permanent loan modification.  Defendant again claimed that Plaintiffs had not provided all of the required paperwork, and instructed them to continue making payments in the amount of the probationary payments contemplated in the TPP Agreement.

61.     Thereafter, Plaintiffs timely made payments due in July 2010 and August 2010 and again requested that Defendant send them any paperwork that needed to be signed and returned.

62.     On or about August 27, 2010, despite having timely made all of the probationary payments contemplated in the TPP, and signing and returning all of the paperwork provided to Plaintiffs from Defendant,  Defendant sent Plaintiffs a letter denying them a permanent loan modification.

63.     Upon receipt of the denial letter, Plaintiffs called Defendant and again asked it to send them any paperwork that needed to be signed.  Defendant then told Plaintiffs that they were missing the IRS Form 4506-T, and, for the very first time, that they could download it from the Internet.  Plaintiffs immediately downloaded IRS Form 4506-T, signed and returned it to Defendant.  Defendant instructed Plaintiffs to call back in 72 hours.

64.     Approximately 72 hours later, Plaintiffs called Defendant and were informed that they were no longer in the modification program, that their loan was in collection, and demanded $2,609.00.

65.     Thereafter, Defendant called Plaintiffs and offered to capitalize all past due amounts and extend the loan term to 40 years.  The loan offered to Plaintiffs by Defendant had an interest rate of 5.75%, which is the same interest rate as Plaintiffs' mortgage loan.  The loan offered to

Plaintiffs by Defendant had a payment amount of $1,116.00, $139.51 more than the TPP payments.

66.     Plaintiffs complained to Defendant that the loan offered to them had a monthly payment more than the TPP payments, a 40 year term, and the same interest rate.  In response, Defendant offered Plaintiffs a different loan whereby it offered to capitalize all past due amounts and extend the loan term to 30 years.  The second loan offered to Plaintiffs by Defendant also had an interest rate of 5.75%, which is the same interest rate as Plaintiffs' mortgage loan.  The second loan offered to Plaintiffs by Defendant had a payment amount of $1,188.00, $220.51 more than the TPP payments.

67.     Plaintiffs complained to Defendant that the second loan offered to them had a monthly payment more than the TPP payments and the same interest rate.  Plaintiffs asked for one week to consider Defendant's second loan offer.  Defendant declined to give Plaintiffs the requested time to consider the second loan offer and informed them that they had 2 hours to decide whether or not it would accept the second loan offer.

68.     Reluctantly, Plaintiffs agreed to accept the second loan offer despite the fact that it had a monthly payment more than the TPP payments and the same interest rate.

69.     The three-month Trial Period Plan, which should have led to a permanent loan modification offer by the end of June, 2010, did not result in any determination by Defendant during that time frame.

70.     Despite Plaintiffs compliance in all material respects with the terms of the TPP Agreement, Plaintiffs were not offered a timely and accurate permanent loan modification under the HAMP Program guidelines.

71.     Like the other class members in this matter, Plaintiffs had been living in limbo, without any assurances that their home would not be foreclosed, despite their compliance with

HAMP requirements and their continued monthly payments under the TPP and/or have been coerced and/or induced into signing inaccurate permanent HAMP loan modifications.

### *Class Allegations*

72.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

73.     This class action is brought by the Plaintiffs on behalf of themselves and all Connecticut homeowners whose loans have been serviced by Defendant and who, since April 19, 2009, have complied with their obligations under a written TPP and have not received a timely and/or accurate permanent HAMP modification.

74.     Excluded from the Class is Defendant, any entity in which Defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by Defendant and/or any of its officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

75.     Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

76.     Plaintiffs do not know the exact size or identities of the proposed class, since such information is in the exclusive control of Defendant. Plaintiffs believe that the class encompasses many hundreds of individuals and whose identities can be readily ascertained from Defendant's books and records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

77.     Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

78.     All members of the class have been subject to and affected by the same conduct. The claims are based on standard form contracts and uniform loan modification processing

requirements. There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

a.    the nature, scope and operation of Defendant's obligations to homeowners under HAMP;

b.    whether Defendant's receipt of an executed TPP Agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Defendant to offer class members a permanent HAMP modification;

c.    whether Defendant's failure to timely provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

d.    whether Defendant's conduct violates the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a et seq. and applicable regulations; and

e.    whether the Court can order damages and enter injunctive relief.

79.    The claims of the named Plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the class in that both the Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a timely and/or accurate permanent modification.

80.    The named Plaintiffs will fairly and adequately represent the interests of the class. They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

81.    A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

82.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

83.    The Defendant has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I
### *Breach of Contract*

84.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

85.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

86.    As described above, the standard TPP Agreements sent by Defendant to each Plaintiff constitutes a valid offer.

87.    By executing the TPP Agreements and returning them to Defendant along with the supporting documentation, Plaintiffs accepted Defendant's offer.

88.    Alternatively, Plaintiffs' return of the TPP Agreements constitutes an offer. Acceptance of these offers occurred when Defendant accepted Plaintiffs' TPP payments.

89.    Plaintiffs' TPP payments to Defendant constitute consideration. By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home.

90.    Plaintiffs and Defendant thereby formed valid contracts.

91.    To the extent that the contract was subject to a condition subsequent by providing BAC an opportunity to review the documentation submitted by Plaintiffs when they returned the

signed TPPs, to determine its sufficiency, this condition was waived by BAC in that it failed to timely raise it and/or it is estopped to assert it as a defense to Plaintiffs' claim.

92. By failing to timely offer Plaintiffs permanent HAMP modifications, Defendant breached those contracts.

93. By failing to accurately offer Plaintiffs a permanent HAMP modification and on the same terms and conditions as the TPP, Defendant breached that contract.

94. Plaintiffs have suffered harm and are threatened with additional harm from Defendant's breaches. By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their home, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. Some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

## COUNT II
### *Breach of the Implied Covenant of Good Faith and Fair Dealing*

95. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

96. Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

97. Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

98. The covenant of good faith and fair dealing is a rule of construction on contracts "designed to fulfill the reasonable expectations of the parties as they presumably intended." *Magnon v. Anaconda Industries Inc.*, 193 Conn. 558, 567 (1984).

99. Defendant routinely and regularly breaches this duty by:

      a.      failing to perform loan servicing functions consistent with its responsibilities

to Plaintiffs;

b.      failing to properly supervise its agents and employees including, without

limitation, its loss mitigation and collection personnel and its foreclosure

attorneys;

c.      routinely demanding information already in its files;

d.      making inaccurate calculations and determinations of Plaintiffs' eligibility for

HAMP;

e.      failing to follow through on written and implied promises;

f.      failing to follow through on contractual obligations; and

g.      failing to timely give timely and/or accurate permanent HAMP modifications

and other foreclosure alternatives to qualified borrowers.

100.    As a result of these failures to act in good faith and the absence of fair dealing,

Defendant caused Plaintiffs harm, as alleged above.

## COUNT III
### *Promissory Estoppel, in the alternative*

101.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described

above.

102.    Defendant, by way of its TPP Agreements, made representations to Plaintiffs that if

they returned the TPP Agreements executed and with supporting documentation, and made their

TPP payments, they would receive permanent HAMP modifications.

103.    Defendant's TPP Agreements were intended to induce Plaintiffs to rely on them and

make monthly TPP payments.

104.    Plaintiffs did indeed rely on Defendant's representation, by submitting TPP

payments.

105.    Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

106.    Plaintiffs' reliance was to their detriment. Plaintiffs failed to timely receive a permanent and accurate HAMP modification and have lost the opportunity to fund other strategies to deal with their default and to avoid foreclosure.

## COUNT IV
### *Unjust Enrichment, in the alternative*

107.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

108.    To the extent no breach of contract claim is sustained, this Count is pled in the alternative.

109.    By wrongfully failing to offer Plaintiffs, and all putative class members, a timely and/or accurate permanent HAMP modification, in violation of their rights, Defendant has and continues to receive substantial financial benefits.

110.    Defendant unjustly failed to pay Plaintiffs, and all putative class members, for the value of those benefits.

111.    Defendant's failure to pay Plaintiffs, and all putative class members, for those benefits is to their detriment.

112.    As a consequence, Defendant has been unjustly enriched at the expense and detriment of Plaintiffs, and all putative class members, who have been and continue to be deprived of a timely and/or accurate permanent HAMP modification, in violation of their rights.

## COUNT V
### *Violation of the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a et seq. and Applicable Regulations* **On behalf of Kim Morrow and Ken Clark, and a class of similarly situated individuals ("the enumerated plaintiffs")**

113.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

114.     The enumerated plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

115.     Defendant has and continues to commit unfair or deceptive acts or practices within the State of Connecticut in violation of the Connecticut Unfair Trade Practices Act, C.G.S. §§ 42-110a et seq., in that Defendant knowingly, willfully, intentionally, maliciously, and wantonly has and continues to wrongfully fail offer Plaintiffs, and all putative class members, a timely and/or accurate permanent HAMP modification, in violation of their rights.

116.     Defendant's acts or practices for profit, by knowingly, willfully, intentionally maliciously, and wantonly failing to offer Plaintiffs, and all putative class members, a timely and/or accurate permanent HAMP modification, in violation of their rights, are unfair, deceptive and offend Connecticut's public policy.

117.     Defendant's unfair or deceptive acts or trade practices for profit are immoral, unethical, oppressive, despicable, reprehensible, and unscrupulous, in that Defendant knowingly, willfully, intentionally, maliciously, and wantonly has and continues to fail to offer Plaintiffs, and all putative class members, a timely and/or accurate permanent HAMP modification, in violation of their rights, in order to maximize its profits at the expense and to the detriment of Plaintiffs and all putative class members' rights.

118.     Defendant's unfair or deceptive acts or trade practices for profit have and continue to cause substantial financial injury to Plaintiffs, and all putative class members, in that Defendant has wrongfully failed to offer a timely and/or accurate permanent HAMP modification, in violation of their rights, and/or by coercing and/or inducing them to pay millions of dollars in principal and interest payments that they had no obligation to pay.

119.     As a consequence of Defendant's unfair or deceptive acts or trade practices for

profit, Plaintiffs, and all putative class members, have been and continued to be deprived of the possession and use of their money that Defendant collected from them.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.   Certify this case as a class action and appoint the named Plaintiffs to be class representatives and their counsel to be class counsel;

b.   Enter a judgment declaring the acts and practices of Defendant complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to timely offer permanent and/or accurate modifications to class members on the terms promised in class members' temporary modifications;

c.   Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.   Order Defendant to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.   Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

f.   Award actual damages pursuant to C.G.S. § 42-110g to the Plaintiffs and the class;

g.   Award punitive damages pursuant to C.G.S. § 42-110g to the Plaintiffs and the class;

h.   Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees pursuant to C.G.S. § 42-110g; and

i.   Grant Plaintiffs and the Class such other and further relief as this Court finds

necessary and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

PLAINTIFFS

KIM MORROW and
KEN CLARK

BY_____

      Peter M. Van Dyke, ct24747
      pvd@eddf-law.com
      Eagan, Donohue, D'Occhio & Falsey, LLP
      24 Arapahoe Road
      West Hartford, CT 06107
      Tel: (860) 232-7200
      Fax: (860) 232-0214